IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

BRENDA S. STALNAKER,

        Plaintiff,

v.

                                         Civil Action No. 5:10cv36
                                              (Stamp)

MICHAEL J. ASTRUE,
COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain

judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying

her claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act

("Act"), 42 U.S.C. §§ 1381-1383f. The matter is awaiting decision on the parties' cross Motions for

Summary Judgment, and has been referred to the undersigned United States Magistrate Judge for

submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B);

Fed. R. Civ. P. 72(b).

### I. Procedural History

Brenda Stalnaker ("Plaintiff") filed her current application for SSI on July 16,

2007(protective filing date), alleging disability beginning December 1, 2001, due to lower back

problems, bipolar/depression and arthritis (R. 200).[1] The application was denied initially and on

reconsideration (R. 101, 108). Plaintiff requested a hearing, which Administrative Law Judge

("ALJ") Richard D. Brady held on May 5, 2009 (R. 25). Plaintiff, represented by counsel, testified

---

[1]The current application is Plaintiff's third. The prior two claims were denied by an ALJ
on September 21, 2004 (R. 9) and June 27, 2007 (R. 9).

on her own behalf, along with Vocational Expert James Ganoe ("VE"). Plaintiff also requested

reopening of the previous unfavorable decision dated June 27, 2007. By decision dated June 24,

2009, the ALJ denied benefits and declined to reopen the prior decision (R. 9, 17). The Appeals

Council denied Plaintiff's request for review on February 2, 2010, rendering the ALJ's decision the

final decision of the Commissioner (R. 1).

## II. Reopening the Prior Decision

As a threshold matter, the undersigned notes Plaintiff discusses in her brief the current

ALJ's failure to reopen her prior claim based on "new and material evidence." Plaintiff does not cite

the failure to reopen as an actual issue; therefore the undersigned believes this claim has been

abandoned. In an abundance of caution, and in order that the prior decision may be considered final

in this decision, the undersigned will address the issue, however. In her "Background of the Case,"

Plaintiff states, in pertinent part:

> Brenda sought reopening on the basis of new and material evidence. The prior ALJ
> had found that Brenda's only severe impairment was the low back impairment and
> that there was no severe mental impairment . . . . Part of the new and material
> evidence consisted of the longitudinal United Summit Center mental health records
> from 2003 through 2009 and a consultative evaluation by Dr. Sharon Joseph, PhD[2]
> which indicated that the mental impairment found "not severe" by the prior ALJ is
> "severe." The diagnosis of Bipolar I, Disorder, Mixed, 296.52 was accompanied by
> two new diagnoses of Borderline Intellectual Function, V62.89 and Pain Disorder
> with Both Physical and Psychological Components, 307.89. The new evidence also
> indicated that Brenda's mental condition is felt to meet Listing 12.04(C)(2) . . .
> .Joseph reviewed the evidence of both mental and physical impairments as a part of
> her evaluation . . . .

This Court does not have jurisdiction to review a final decision of the Secretary not to reopen

a claim for benefits. Holloway v. Schweiker, 724 F.2d 1102 (4th Cir. 1984)(citing Califano v.

---

[2]Performed in 2009.

Sanders, 430 U.S. 99, 97 S. Ct. 980 (1977)). While establishing a general rule that courts lack jurisdiction to review a decision by the Secretary not to reopen a claim for benefits, the Sanders court did recognized a limited exception where the claimant has challenged the Secretary's decision on constitutional grounds. See, e.g., Schrader v. Harris, 631 F.2d 297 (4th Cir. 1980). Plaintiff here has not challenged the Secretary's denial on constitutional grounds, however, and the undersigned finds none. Nor did the current ALJ explicitly or implicitly reopen the case to reconsider the merits of the first determination. See Cooper v. Chater, 103 F.3d 116 (4th Cir. 1996)(unpublished). First, a review of the current decision does not indicate the ALJ reconsidered the merits of the prior claim. Even if he had, "[a]s we stated in McGowen, the Secretary must be afforded some leeway in making a decision whether to reopen, so that it may in fairness look far enough into the proffered factual and legal support to determine whether it is the same claim." The undersigned finds the ALJ at most engaged in this "simple inquiry" and no more. Accordingly, this Court does not have jurisdiction to review the ALJ's decision not to reopen the prior claim.

Consequently, the ALJ found the prior decision final and binding on the issue of disability during the previously adjudicated period through June 27, 2007. Pursuant to Acquiescence Ruling 00-1(4), he also considered and evaluated the findings in the prior decision. He then incorporated and adopted the prior decision in its totality, finding no significant change in the claimant's lumbar impairment. He found that impairment continued to cause significant limitation in her ability to perform basic work activities. He did, however, add an additional severe impairment of bipolar disorder, which the earlier ALJ had not found to be severe (R. 11-12).

### III. Statement of Facts

Plaintiff was born on December 4, 1959, and was 49 years old at the time of the ALJ's

decision (R. 15, 35). She completed the tenth grade, earned her GED, and completed 24 credits at Glenville State College and West Virginia Business College (R. 35). She earned her CNA certification and last worked as a nurse's aide in or around 1998 (R. 40). She later worked for brief periods of time as a housekeeper at a motel and as a telemarketer. She last worked in 2002 (R. 42).

Plaintiff argues only regarding her mental impairments, although arguing that a pain disorder does cause increase in her pain. The undersigned therefore finds substantial evidence supports the ALJ's determination regarding Plaintiff's physical impairments, and shall only recite the mental evidence of record, and only during the time period at issue– that is, from June 27, 2007, until June 24, 2009.

The prior unfavorable ALJ decision was entered June 27, 2007. Plaintiff filed her current application on July 16, 2007.

On July 25, 2007, Plaintiff presented to United Summit Center for her yearly review (R. 315). She reportedly had first been seen there on June 17, 2003. She attended alone. Her presenting problems were moderate withdrawal, depression, guilt, anxiety, agitation, and low energy. She had decompensated in the past 90 days, and stated she felt more depressed due to her physical problems and financial problems.

Plaintiff had never been hospitalized for mental illness and denied any family history of mental illness. She was currently prescribed celexa, Trazadone, Risperdal, Buspar, Cymbalta, trileptal [sic] and Vistaril.

Upon Mental Status Exam, Plaintiff was alert and fully oriented. She made minimal eye contact. Her dress and grooming were adequate and her speech was normal. She did not display any unusual movements or tics. Her mood was depressed.

Plaintiff was diagnosed with Bipolar I Mixed Moderate, currently or most recently mixed. Her GAF was assessed as 60.[3]

In Plaintiff's Disability Report dated July 26, 2007, she reported her medications as amitriptyline, citalopram, cymbalta, diclofenac, Hydroxysine, lyrica, Risperdal, skelaxin, Trazadone treptal and Wellbutrin. She listed her side effects for each and every one of these medications as "none."(R. 205). On August 2, 2007, she wrote that the pills she took for bipolar, depression, and anxiety, and her back made her sleep (R. 219). On a Function Report written that same date, Plaintiff stated she took care of pets, stating: "take outside to use bathroom, feed and water" (R. 213). She did not need any help from others with this chore. She reported her impairments did not cause her any problems getting along with others. She said she got along with authority figures, including bosses, "fine" (R. 218).

On October 9, 2007, physician Gregg O'Malley, M.D. found that Plaintiff had cubital tunnel syndrome of the elbow and planned surgery (R. 694). The surgery was performed successfully. Dr. O'Malley opined: "Otherwise, she is pretty healthy. Her only other conditions are back pain and bipolar disorder but she seems to be under good control with that."

On November 15, 2007, State agency reviewing psychologist Philip Comer, PhD, opined that Plaintiff was not markedly limited in any area. She was moderately limited in her ability to maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an

_____

[3]A GAF of 51-60 indicates **Moderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflict with peers or coworkers). Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994). (Emphasis in original).

unreasonable number and length of rest periods; interact appropriately with the general public; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting. She was not significantly limited in any other area (R. 341). Dr. Comer opined that Plaintiff's functional limitations did not call for an RFC allowance. She appeared to have the mental/emotional capacity for work-related activity in a low stress/demand work environment that could accommodate some mood lability and her physical limitations (R. 342).

Dr. Comer also completed a Psychiatric Review Technique ("PRT") opinion that Plaintiff had an affective disorder under 12.04 consisting of bipolar I mixed, moderate. He found she would have moderate restriction of activities of daily living; moderate difficulties maintaining social functioning; and moderate difficulties maintaining concentration, persistence or pace. She had had one or two episodes of decompensation (R. 354). He opined that the evidence did not establish the "C" criteria of any listing.

On January 9, 2008, Plaintiff presented to United Summit Center for a Review Assessment (R. 655). Her reported presenting problems were severe depression, and decreased energy, appetite and sleep. The reviewer found she had decompensated, but had not been compliant with treatment and had not been taking any of her medications. She stated she was having problems financially, physically, and socially. She lost a lot of weight. She was scheduled to see a lawyer about her disability that week. She was currently prescribed Trazadone, Depakote, Risperdal, Buspar, Vistaril, and Cymbalta (but as noted had not been taking any of them). She was to see psychiatrist Dr. Scharf the next week to "start back on her medications."

On Mental Status Exam, Plaintiff was alert and fully oriented. She made good eye contact.

Her mood was somewhat depressed. She was dressed appropriately. Her affect was blunted. Her grooming was appropriate. Speech was normal. It was noted that Plaintiff had attended only one out of five pharmacological management appointments, and it was opined that she had "decompensated due to personal problems and non-compliance with medications and treatment" (R. 657). She reported severe depression, low energy, decreased appetite, decreased sleep, moderate withdrawal, agitation, helplessness/hopelessness and low energy; mild dysfunction in self care; mild dysfunction in activities of community living; moderate dysfunction in socialization; and moderate dysfunction in concentration and task performance (R. 659).

On January 30, 2008, Plaintiff again reported in an SSA form her medications caused no side effects (R. 227), but then later said her medications made her sleepy (R. 228). Trazadone, depakote and risperdal were all taken at bedtime (R. 235).

Plaintiff's ex brother-in law wrote Plaintiff "is unable to work so I help her pay her bills when I can afford to do so" (R. 263).

Plaintiff's sister wrote that she went to Plaintiff's house at least three times a week to do her cleaning and prepare meals for her that she could later heat in the microwave because "the medication she is on makes her want to sleep all the time and she can not do these things for herself. I also help her pay her bills when I can afford to do so." (R. 264).

Plaintiff's ex-husband wrote that Plaintiff was unable to work so he helped her pay her bills. (R. 265). He wrote in another undated letter that he had to "force" her to bathe or shower.

Sometime after February 18, 2008, Dr. Sharf completed a form for the State DHHR, stating that Plaintiff had Bipolar I Disorder, mixed; her prognosis was poor; it was expected to last a lifetime; and she was not capable of gainful employment (R. 382).

On March 19, 2008, Plaintiff underwent a Mental Status Examination performed by psychologist Robert Klein, Ed.D. (R. 383). She drove herself to the evaluation and appeared by herself. She was fully cooperative, her attitude was positive, her posture was normal, her gait was steady, there were no involuntary movements, and she used no assistive device. She said her chief complaint was back problems and a bipolar condition. She said her medication made her want to sleep all the time. Her appetite was good. She reported no crying spells, suicidal thoughts, panic attacks, OCD or PTSD symptoms. While on medication, she had no "more" hallucinations. She had no energy. She had no weight loss. She described her mood in the past two weeks as depressed, but not as bad since the new medicine was started several weeks ago. She was depressed as far back as when her mother died in 1986. She also had times of feeling irritable and angry without cause, but mostly was almost always depressed.

On mental status examination, her appearance, hygiene, and grooming were appropriate. Posture was normal and gait steady. Her attitude was positive, cooperation good, social interaction within normal limits, eye contact good, and length and depth of verbal responses was good. She had a sense of humor, was spontaneous, was fully oriented, and her speech was relevant. Mood was dysphoric and affect restricted. She had preoccupations. Her insight was mildly deficient. Comprehension was within normal limits, immediate and remote memory were within normal limits, and recent memory was mildly deficient. Concentration was within normal limits, and pace, persistence and psychomotor behavior were all within normal limits. Social functioning was considered mildly deficient.

Plaintiff described her typical day as getting up about 6 am, eating and fixing all her meals, watching tv, and sitting around or sleeping most of the time because of her medications. She usually

went to bed about 10pm. She cared for her own personal hygiene. She did all of the cooking, cleaning, dishwashing, and laundry. She drove, shopped, and went to the post office. She preferred, however, to stay home and watch television. She spent time with family but had no non-social activities or other hobbies.

Dr. Klein found Plaintiff's psychological presentation appeared to meet the necessary criteria for a Bipolar I Disorder, Most Recent Episode Depressed, Severe, Psychotic features, although he noted the auditory hallucinations appeared to be ameliorated by her medications since 2004.

On April 1, 2008, State Agency Reviewing psychologist James Bartee, Ph.D. completed a PRT opining that Plaintiff had a bipolar syndrome that was currently severe, but not expected to last in severity for 12 months (R. 396). He found she had mild restriction of daily activities, mild difficulties in maintaining social functioning, mild difficulties maintaining concentration, persistence or pace, and had no episodes of decompensation (R. 406). There was no evidence to meet the "C" criteria of any mental Listing.

Dr. Bartee summarized his findings by stating that Plaintiff's most recent evaluation of March 19, 2008, showed her condition had improved since the last PRT dated November 15, 2007. Her diagnosis was still bipolar, "but functionally she appears to me much lest [sic] severely impacted by her s[ymptoms]" Her social functioning was normal, concentration was normal, she had mild limitations in recent memory, but her memory was otherwise normal. She managed her own household chores. She said she was sleepy a lot due to meds; however, she was fully alert and oriented and her social comprehension was normal. Her mood was dysphoric with restricted affect. Dr. Bartee concluded: "Given marked improvement since last PRTF/MRFC, I believe claim will non-severe by 11/15/2008" (R. 408).

A physical RFC completed by State Agency physician Fulvio Franyutti, M.D. on April 4, 2008, noted that Plaintiff's symptoms were only partially credible. Her symptoms were not totally consistent with questionnaires which indicated constant pain, no relief from medication with side effects, and restricted ADL's due to pain and limited standing, walking, and lifting. He opined that pain questionnaires indicated an inconsistency with the consultative examiner report concerning the results of medication and the questionnaire was inconsistent with the reported side effects from medication.

On April 30, 2008, psychologist Sharon Joseph completed a PRT opining Plaintiff met listing 12.04 for her bipolar disorder, and equaled listings 12.05 for retardation (due to borderline intellectual functioning) and 12.07 for pain disorder. (R. 435). She did not, however, fill out any of the form for the "A" criteria of any affective disorder, including bipolar syndrome (R. 438). She did fill out the form for 12.05 mental retardation, finding although Plaintiff did not precisely satisfy the diagnostic criteria she did have borderline intellectual functioning (R. 439). She also opined Plaintiff met the listing for 12.07 for somatoform disorder ,again saying she did not precisely satisfy the diagnostic criteria for the listing but had a pain disorder with both physical and psychological features (R. 441).

Dr. Joseph opined that Plaintiff would have moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace, and had one or two episodes of decompensation, each of extended duration (R. 445). Notably these do not meet the "B" criteria for any listing, although that is not necessary to a finding of meeting the "C" criteria.

Dr. Joseph opined that Plaintiff met the Listing for 12.04(C)(2), which calls for a:

> Medically documented history of a chronic organic mental (12.02), schizophrenic, etc (12.03), or affective (12.04) disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do any basic work activity, with symptoms or signs currently attenuated by medication or psychosocial support, **and** one of the following:
>
> ...
>
> A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate.
>
> ....

(R. 446)(emphasis added).

On May 8, 2008, Plaintiff presented to United Summit Center for her Review Assessment (R. 663). Her presenting problems were moderate depression, agitation, low energy, withdrawal, poor concentration, and loss of interest (R. 663). She had made good progress, however, due to the effectiveness of her medications. She was still trying to get SSI but could not find a lawyer to take her case.

On Mental Status Examination, Plaintiff was alert and fully oriented. She was dressed appropriately with good grooming and hygiene. She was calm and cooperative. Speech was normal. She displayed no unusual movements or tics. She made good eye contact. Affect and mood appeared normal. (R. 663).

On August 1, 2008, Plaintiff presented to United Summit Center for her yearly review (R. 726). She arrived alone. Her son was currently living with her. Her presenting problems were moderate depression, agitation, low energy, loss of interest, and withdrawal. She had made some improvements in appetite, concentration, judgment, and sleep. She reported some medications were effective, but some "ma[d]e her feel drowsy at times." She reported she had finally found an attorney to take on her disability case, and "appeared to be really happy, because she could not find a lawyer to take her case for the past year."

Upon Mental Status Examination, Plaintiff was alert and fully oriented, dressed appropriately and was calm and cooperative. She made normal eye contact and did not display any unusual thoughts or behaviors. Her speech was normal. She continued to be diagnosed with Bipolar I (mixed moderate) and again had a GAF of 60.

On August 29, 2008, psychologist Sharon Joseph conducted a psychological evaluation of Plaintiff upon referral from her attorney (R. 742). Plaintiff denied using tobacco, said she never had an alcohol problem, and drank 12 cups of coffee per day. Dr. Joseph noted a report from USC by her psychiatrist Dr. Scharf dated July 16, 2003, diagnosing Plaintiff with bipolar disorder, mixed, and Alcohol Dependence, in partial remission, and Personality Disorder NOS.

While Dr. Joseph notes the July 25 diagnoses from USC, and expressly notes the report states Plaintiff had decompensated, she fails to mention that this was found to be due to Plaintiff's non-compliance with medications and treatment. (R. 744). And even on that occasion, Plaintiff's GAF was assessed as 60.

Testing by Dr. Joseph showed Plaintiff's IQ was Verbal 83, Performance 79, and Full Scale 79 (R. 745). Dr. Joseph noted ""The Full Scale IQ score of 79 falls at the upper end of the Borderline Range of intellectual functioning." (R. 745). Achievement tests showed Plaintiff read at the high school level, spelled at the sixth grade level and performed math at the sixth grade level.

Dr. Joseph found the MMPI-2 Personality testing was valid, although at the same time noting, "responses to items near the end of the MMPI-2 were exaggerated in comparison to the earlier section," so clinical items were scored from the early section of the test. Still, she warned, "caution is used in interpreting content and supplemental scales." Her results showed Plaintiff may be passive and dependent, avoid confrontation and blame herself for interpersonal problems; people

with Plaintiff's results tended to form deep attachments and were often prone to being easily hurt by others. The results showed she may be introverted, shy and emotionally distant, uneasy and overcontrolled in social situations and may exhibit social withdrawal. "Such individuals may receive diagnoses such as <u>Dysthymic Disorder, Anxiety Disorder, Dependent, or Compulsive Personality Disorder</u>."[4] (Emphasis added).

On Mental Status Exam Plaintiff was alert, oriented, and cooperative. She was neatly and cleanly dressed. She had no obvious physical limitations. She denied appetite disturbance but did report she has had difficulty sleeping. "However, when she takes her medications, she is able to get to sleep." Her mood appeared to be depressed. She was tearful at various times throughout the interview. She denied suicidal or homicidal ideation although she stated that in 2004, before she was ever on medications, she threw a knife at her husband (missing him). There were no perceptual or thinking disturbances relative to hallucinations or delusions, although she said that once, a year earlier, she saw her mother, who was deceased, standing in the kitchen. She had not had any hallucinations since that time. There were no preoccupations, obsessions or compulsions. Her motor activity was "nervous." Eye contact was average and posture appropriate. Language and speaking were normal and speech was relevant. Conduct was cooperative. There were no psychomotor disturbances. Her affect was labile. She was tearful at times and anxious at others. Her insight appeared fair. Concentration was within normal limits; judgment was considered mildly impaired, and immediate, recent, and remote memory were all within normal limits.

Plaintiff stated she got up at 6 am, made coffee, took her medicines, and went back to sleep. In the evening, she slept, took a shower, and ate. She went to bed about 7 pm. She made the bed,

_____

[4]Plaintiff was not diagnosed with any of these disorders.

cooked as long as she didn't have to stand very long, and put away groceries. She could go grocery shopping and manage her own finances. She was unable to run the vacuum or clean the bathroom due to her back problems. She said she did not drive due to sleepiness related to her medications.

Plaintiff reported she had friends although she did not belong to any groups She used to crochet but no longer could. She liked to read and watch tv. Socialization was considered by Dr. Joseph to be moderately impaired.

Dr. Joseph diagnosed Bipolar Disorder I, mixed, most recent episode depressed, and moderate; Pain Disorder with both physical and psychosocial components; and Borderline Intellectual Functioning. Her GAF was assessed as 58 (still moderate).

On August 4, 2008, Plaintiff presented to the ER for dog bites to her right arm and left side of chest (R. 703). She said she was the owner of the dog which had bitten her -- a Chow.[5],[6]

On October 29, 2008, Plaintiff presented to United Summit Center for a Review Assessment (R. 763). She reported moderate depression, withdrawal, agitation, low energy, change in appetite and loss of interest. She said she had not made any progress due to her aunt passing away from cancer. She was very close to her aunt and was at her bedside when she passed away. "Brenda did not report any negative side effects with her current medications."

On Mental Status Examination Plaintiff was alert and fully oriented. She was dressed appropriately with good grooming and hygiene. She was calm and cooperative, made good eye

---

[5]According to the American Kennel Club website, a "powerful, sturdy dog, medium in size and muscular with heavy bone. They require some kind of exercise daily, and regular grooming and bathing to maintain their double coats. Males weigh 55 -70 pounds and females 45-60 pounds. http://www.akc.org/breeds/chow_chow/index.cfm . April 11, 2011.

[6]Plaintiff reported having no pets and not caring for any pets in her February 2008, Functional Report, but did report having pets and just taking them outside and feeding them in 2007.

contact, her speech was normal and she did not display any unusual thoughts or behaviors. Her affect and mood were depressed. Under her treatment plan it stated: "Brenda has not made any progress due to her aunt passing away" (R. 7650.

On December 8, 2008, Dr. Sabbagh completed a physical examination form for the State DHHR in order for Plaintiff to continue receiving her medical card. His diagnoses included bipolar disorder, back pain, history of chest pain, and history of anxiety. He then found she had "History of Bipolar - - Stable." He then opined she could not do any full time work due to her back pain and bipolar disorder.

On January 20, 2009, Plaintiff presented to United Summit Center for a Review Assessment (R. 805). Her presenting problems were moderate depression, agitation, low energy, change in appetite, loss of interest, and withdrawal. She had not made any progress, "but remain[ed] stable." She was still mourning the loss of her aunt, and was experiencing more back pain due to the cold weather. She reported increased stress, "due to applying for disability." She had hired an attorney to take her case. This was her fourth time applying for disability.

"Plaintiff did not report any negative side effects with current medications." (R. 805).

Upon Mental Status Exam Plaintiff was alert and fully oriented. She was dressed appropriately and had normal hygiene and grooming. She was calm and cooperative. She made good eye contact. Her affect and mood appeared to be normal. She did not display any psychomotor agitation or any abnormal thoughts or behavior. Her speech was normal.

Some time after February 2009, United Summit Center completed a form for the State DHHR, stating that Plaintiff had a diagnosis of Bipolar I, mixed (R. 818). Her prognosis was "poor" and her disability was expected to last a "lifetime" and she was "not capable of gainful employment."

As of March 2009, Plaintiff was taking Skelaxin, Lyrica, aspirin, Cymbalta, and hydroxyzinepam daily. She also took Amitriptyline, Depakote, trazodone, Risperdal, and zyprexa "at bedtime." (R. 831).

On February 28, 2009, when seen at the ER for acute bronchitis, Plaintiff reported smoking two to three packs of cigarettes daily (R. 833).

At the second administrative hearing held on May 5, 2009, Plaintiff stated she slept well at night due to her medications, but also then slept about seven additional hours during the course of the day, for a total of 18 to 19 hours in a 24-hour period (R. 51). She testified her doctors were aware of this.

Plaintiff testified she had chest pains that her cardiologist "thought maybe [were] due to stress and anxiety" (R. 60). She had them when she got upset or agitated which was about twice a week. When asked what caused her to get upset and agitated she said her daughter, explaining as follows:

> She's planning her wedding and she wants me to do everything. And if I don't do it, then she'll call and get upset with me and start screaming and yelling at me which gets me upset.

(R. 61). When asked what she was able to do for her daughter's wedding, Plaintiff testified:

> At this time, nothing, because she needs money to get everything with and I don't have it. And that's what she gets upset with me for and - -

(R. 61).

When asked why she had difficulty with the telemarketing job besides her back pain, Plaintiff testified:

> Yeah. I couldn't get - - there was people that you call that would kind of get rude with you and it was very hard for me to keep from losing my temper. I get agitated real easy. That's why when I go to the store I like to get in and out, because I can't

stand to be around a bunch of people.

(R. 64). Plaintiff was then asked if she had ever been rude to a caller, to which she testified:

> I had a gentleman that I was calling and he made some kind of nasty remarks towards me. And I just started cussing him and I got wrote up for it. I didn't get fired for it because it was my first offense, but I got wrote up for it.

(R. 64).

She also testified he had problems when the bosses would tell her to do something and then come back and tell her she didn't do it right, which got her upset. She testified she "had a problem with authority figures."[7]

In response to a question from the ALJ Plaintiff testified she had an alcohol problem in the past, but had had no alcohol since 2003 (R. 67).

The ALJ entered his unfavorable decision on June 24, 2009 (R. 17).

### Evidence Submitted to the Appeals Council After the ALJ's Decision

Plaintiff does not argue that the Appeal Council erred. The undersigned nevertheless notes evidence submitted shortly after the ALJ's decision. On July 7, 2009, Plaintiff presented to United Summit Center for her yearly review (R. 853). Her presenting problems were moderate depression, anxiety, agitation, low energy, loss of interest, withdrawal and poor concentration. She had not made any progress "due to health and financial problems." She reported that "ever since she hurt her back, in late March, she had been having difficulty getting around and doing house chores." (Emphasis added). She now had to pay someone to come to her house to do her house chores. She said she could hardly drive due to her back pain. She also reported getting more depressed around the 4th of

---

[7]In her February 2008 Function Report Plaintiff stated she got along with authority figures (including bosses) "fine" (R. 242).She also reported her conditions did not affect her ability to get along with others.

July due to her cousin passing away on that date seven years ago. She also reported having been denied disability for the fourth straight time.

Plaintiff stated she had experienced psychiatric symptoms "since she could remember," and had them on a daily basis.

Upon Mental Status Exam, Plaintiff was alert and fully oriented. She was appropriately dressed. She was calm and cooperative and made normal eye contact. She did not display any unusual thoughts or behaviors. Her speech was normal. She was again diagnosed with Bipolar I mixed, moderate, but with a GAF of 49.[8]

During a physical examination the next day, Plaintiff's physician found her mood was stable on current medications and her affect was euthymic[9] with full range (R. 869).

During a physical examination on August 12, 2009, Plaintiff's doctor found her mood and affect stable (R. 867).

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 416.920, ALJ Brady made the following findings:

1.  The claimant has not engaged in substantial gainful activity since July 16, 2007, the application date (20 CFR 416.971 *et seq.*).

2.  The claimant has the following severe impairments: degenerative disc disease; bipolar disorder (20 CFR 416.920(c)).

---

[8]A GAF of 41-50 indicates **Serious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job). Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994). (Emphasis in original).

[9]Euthymia– a state of mental tranquility and well-being; neither depressed nor manic. Dorland's Illustrated Medical Dictionary, (31st ed. 2007).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except she needs to change position between sitting and standing, being able to sit for 45 to 60 minutes and stand for 30 minutes before having to change position for a few minutes; no climbing ladders, ropes or scaffolds; no crawling; occasional climbing stairs, balancing, stooping, kneeling, and crouching; no concentrated exposure to excessive temperatures, dampness or vibration and no exposure to hazardous environment such as dangerous moving machinery or unprotected heights; capable of unskilled work activity with one to three step tasks; simple decision making and responding to routine changes in an unskilled work setting; and no more than occasional and superficial contact with the general public.

5. The claimant is unable to perform any past relevant work (20 CFR 416.965).

6. The claimant was born on December 4, 1959, and is currently 49 years old, which is defined as a younger individual (20 CFR 416.963).

7. The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

10. The claimant has not been under a disability, as defined in the Social Security Act, since July 16, 2007, the date the application was filed (20 CFR 416.920(g)).

(R. 9-17)

# IV. Contentions

Plaintiff contends:

1.     The ALJ's finding that Listing 12.04(C) was not met is not supported by substantial evidence.

2.     The ALJ gave inadequate reasons for discrediting the diagnostic opinion of Dr. Sharon Joseph and failed to include the diagnosis of pain disorder as a severe impairment.

Defendant contends:

1.     Plaintiff failed to meet her burden of demonstrating that she met Listing 12.04(C).

2.     The ALJ's credibility determination should not be disturbed.

3.     The ALJ's Step Five determination is supported by substantial evidence.

# V. Discussion
## A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971)(quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit stated substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984)(quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the court must also consider whether the ALJ applied the proper standards

of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Listing 12.04(C)

Plaintiff first argues that the ALJ's finding that Listing 12.04(C) was not met is not supported by substantial evidence. As a threshold matter, it is important to understand the purpose of the Listings. As the United States Supreme Court stated in Sullivan v. Zebley, 493 U.S. 521, 110 S.Ct.885, 107 L.Ed.2d 967 (1990):

> The Secretary explicitly has set the medical criteria defining the listed impairments at a higher level of severity than the statutory standard. The listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing *any* gainful activity, not just "substantial gainful activity." *See* 20 CFR section 416.925(a)(1989)(purpose of listing is to describe impairments "severe enough to prevent a person from doing *any* gainful activity"); SSR 83-19, at 90 (listings define "medical conditions which ordinarily prevent an individual from engaging in *any* gainful activity"). The reason for this difference between the listings' level of severity and the statutory standard is that, for adults, the listing were designed to operate as a presumption of disability that makes further inquiry unnecessary. That is, if an adult is not actually working and his impairment matches or is equivalent to a listed impairment, he is presumed unable to work and is awarded benefits without a determination whether he actually can perform his own prior work or other work . . . .
>
> Thus, the listings in several ways are more restrictive than the statutory standard . . . . . even those medical conditions that are covered in the listings are defined by criteria setting a higher level of severity than the statutory standard, so they exclude claimants who have listed impairments in a form severe enough to preclude *substantial* gainful activity, but not quite severe enough to meet the listings level - - that which would preclude *any* gainful activity. Third, the listings also exclude any claimant whose impairment would not prevent any and all persons from doing any kind of work, but which actually precludes the particular claimant from working, given its actual effects on him – such as pain, consequences of medication, and other symptoms that vary greatly with the individual and given the claimant's age, education, and work experience. Fourth, the equivalence analysis excludes claimants who have unlisted impairments, or combinations of impairments, that do not fulfill all the criteria for any one listed impairments . . . .
>
> Fn. 14 The Secretary has stated that the severity of perceived symptoms such as pain

has no bearing on the determination whether a claimant's impairment meets or equals a listing. SSR 92-58, Dept. of Health and Human Services Rulings 121 Cum. Ed. 1982)("No alleged or reported intensity of the symptoms can be substituted to elevate impairment severity to equivalency . . . . [C]omplaints of 'severe,' 'extreme,' or 'constant' pain will not compensate for . . . missing medical findings and permit an 'equals' determination").

(Emphasis in original).

To qualify for a disability designation under Listing 12.04(C), Plaintiff must provide evidence of:

> [A] [m]edically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by mediation or psychosocial support, **and** one of the following:
>
> 1. Repeated episodes of decompensation, each of extended duration; or
>
> 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
>
> 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1, section 12.04(C). Further, under Zebley, Plaintiff must show that her bipolar disorder does not just prevent her from performing *substantial* gainful activity, but it must prevent her from performing *any* gainful activity. Id. Additionally, the effects of her bipolar disorder must be so limiting that it would prevent *any and all persons* [not just her] *from doing any kind of work.* Id.

In this case, the ALJ found that the plaintiff suffered from a severe mental impairment, bipolar disorder. There is really no dispute that Plaintiff meets the first part of the Listing. Substantial evidence, however, supports the ALJ's conclusion, that Dr. Joseph's finding that "even

a minimal increase in mental demands or change in the environment would be predicted to cause [Plaintiff] to decompensate" "simply lacks support in the treatment records from United Summit Center showing no episodes of decompensation. The same records noted Plaintiff never received psychiatric crisis stabilization, inpatient or partial hospitalization. Nor did Dr. Joseph's own evaluation disclose otherwise."

One month after the first unfavorable ALJ decision, Plaintiff presented to USC with the presenting problems of "moderate" withdrawal, depression, guilt, anxiety, agitation, and low energy. She had decompensated in the past 90 days, saying she felt more depressed due to her physical and financial problems. First, the undersigned can find substantial support for reasoning that chronic physical pain and financial problems that are bad enough to require relatives to pay one's bills are more than "a minimal increase in mental demands or change in environment." Second, despite Plaintiff's "decompensation" due to these problems, the only reported problems she noted to her evaluator were "moderate" symptoms of anxiety and energy levels; "mild" dysfunction in concentration and task performance; "mild" dysfunction in activities of community living; and "mild" dysfunction in social and family functioning (R. 327). She did not have hallucinations, delusions, paranoia, tangential thinking, loose association, thought blocking, suspiciousness, apathy, panic, phobia, mania, hyperactivity, flat affect or inappropriate affect.

In January 2008, a USC reviewer again found Plaintiff had "decompensated," this time due to being non-compliant with treatment and not taking any of her medications. Notably, by May 2008, only four months later, she had made "good progress due to the effectiveness of her medications." None of her problems were reported as more than "moderate." In August 2008, despite her adult son coming to live with her (which could certainly be considered at least a minimal change in the environment), she had made more improvements, and only listed moderate depression,

agitation, low energy, loss of interest, and withdrawal. In fact, she "appeared to be really happy" because she had found a lawyer to take her disability case. Her GAF was 60.

Despite counsel's representation that Plaintiff had again "decompensated" due to her beloved aunt's death, the report from October 2008 from USC does not state she decompensated, but only that she had not made progress. She still only reported moderate symptoms. Again, in January 2009, there is no report she decompensated, only that she had not progressed. In fact, she had "remained stable" despite her aunt's death, increased back pain due to cold, and increased stress "due to applying for disability."

The undersigned finds none of these symptoms, reportedly due to "decompensation," would prevent Plaintiff, or, more importantly, *any* person, from being able to perform *any* gainful activity.

Regarding Plaintiff's argument that Dr. Scharf opined that she had a poor prognosis with lifetime incapacity/disability and was incapable of gainful employment," the ALJ properly accorded these "conclusory forms" little weight as not being sufficiently supported by specific findings and also being vocational and medical issues reserved to the Commissioner. See section 404.1527(e), which provides, in pertinent part:

> Opinions on some issues, such as the examples that follow, are not medical opinions, as described in paragraph (a)(2) of this section, but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; *i.e.,* that would direct the determination or decision of disability.
>
> (1) *Opinions that you are disabled.* We are responsible for making the determination or decision about whether you meet the statutory definition of disability. In so doing, we review all of the medical findings and other evidence that support a medical source's statement that you are disabled. A statement by a medical source that you are "disabled" or "unable to work" does not mean that we will determine that you are disabled.
>
> (2) *Other opinions on issues reserved to the Commissioner.* We use medical sources,

including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to this subpart, your residual functional capacity (see §§404.1545 and 404.1546), or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

The same section further supports the ALJ's determination that Dr. Joseph's finding that Plaintiff met Listing 12.04(C).

The ALJ also properly found that Dr. Sharf's conclusory reports were inconsistent with the reports of her visits at USC.

Plaintiff also argues that the ALJ failed to discuss that her symptoms were controlled or attenuated by medication and psychosocial support (Plaintiff's brief at 5). Plaintiff cites the introductory section to the mental listings, as follows verbatim:

> F.  Effects of structured settings. Particularly in cases involving chronic mental disorders, overt symptomatology may be controlled or attenuated by psychosocial factors . . . . Highly structured and supportive settings may also be found in your home. Such settings may greatly reduce the mental demands placed on your. With lowered demands, overt symptoms and signs of the mental disorder may be minimized. At the same time, your ability to function outside of such highly structured or supportive settings may not have changed. If your symptomatology is controlled or attenuated, we must consider your ability to function outside of such highly structures settings. For these reasons, identical paragraph C criteria are included in 12.02, 12.03, and 12.04.

The first problem with Plaintiff's argument is that, as section F expressly states, paragraph 3 is included in Listing 12.04(C), precisely to cover the circumstances described. Yet paragraph 12.04(C)(3) was not the basis for Dr. Joseph's finding that Plaintiff met 12.04(C). Instead, Dr. Joseph opined that Plaintiff met 12.04(C)(2), which requires that "even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate." Dr. Joseph did not opine that Plaintiff lived in a "highly structured and supportive setting." The

second problem is that there is no support for a finding that Plaintiff <u>did</u> live in a "highly structured and supportive setting." Significantly, the first sentence of Section F, without the ellipsis in Plaintiff's quote provides as follows:

> Particularly in cases involving chronic mental disorders, overt symptomatology may be controlled or attenuated by psychosocial factors <u>such as placement in a hospital, halfway house, board and care facility, or other environment that provides similar structure</u>.

(Emphasis added). The paragraph then goes on to state that "<u>such</u> highly structured and supported setting may also be found in your home." In other words, for one's home to be considered such a highly structured and supported setting, it would necessarily resemble the structure found in a hospital, halfway house, or board and care facility. The undersigned finds the fact, as stated by counsel, that Plaintiff's relatives helped her pay bills, assisted her at least three times a week in cleaning and cooking, "force[d]" her to shower or bathe, and drive her to appointments," are not the type of "structured setting" contemplated in section F. First, regarding paying her bills, every relative meant helping her financially, not in the actual performance of the act of paying bills. Second, these "to whom it may concern" letters are undated. Plaintiff's ex-husband did write "most of the time I have to force her to take a shower or bath. If I don't she will go days sometimes weeks at a time without a bath," but this statement is not supported by Plaintiff's own reports to her doctors or her doctors' office notes, and, again, is undated.

Remembering that Dr. Joseph did not base her opinion on Plaintiff's living in a highly-structured setting, these letters by Plaintiff's relatives still do not support a finding by her that Plaintiff meets the Listing.

On March 19,2008, Plaintiff described her typical day to Dr. Klein as including caring for her own personal hygiene, doing all of the cooking, cleaning, dishwashing, and laundry, and driving,

shopping, and going to the post office.

Plaintiff told Dr. Joseph at her one examination in August 2008, that in the evening she slept, took a shower, and ate. She made the bed, cooked as long as she didn't have to stand very long, and put away groceries. She could go grocery shopping and manage her own finances. Although she was unable to run the vacuum or clean the bathroom this was due to her back problems. She said she did not drive due to sleepiness related to her medications.

These reports, made by Plaintiff herself, are inconsistent with the undated "to whom it may concern" letter that she had to be forced to bathe. They are also inconsistent with a finding that Plaintiff's bipolar disorder is so limiting that it would prevent her from performing *any* (not just substantial) gainful activity.

Upon consideration of all of the above, the undersigned finds there is substantial support for the ALJ's finding that Plaintiff did not meet Listing 12.04(C).

## C. Psychologist Sharon Joseph's Opinion

Plaintiff next argues the ALJ gave inadequate reasons for discrediting the diagnostic opinion of Dr. Sharon Joseph and failed to include her diagnosis of pain disorder as a severe impairment. 20 C.F.R. § 404.1527 states:

> (d) *How we weigh medical opinions*. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion:
>
> (1) *Examining relationship*. Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
>
> (2) *Treatment relationship* . Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a

unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(I) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

> (I) *Length of the treatment relationship and the frequency of examination*. Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a umber of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

> (ii) *Nature and extent of the treatment relationship*. Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

(3) *Supportability*. The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. . . .

(4) *Consistency*. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

As the ALJ stated, Dr. Joseph is not a treating physician. She is an examining psychologist who saw Plaintiff on one occasion, not to evaluate her for treatment purposes, but to help determine

whether she should be considered disabled for Social Security purposes. As the Regulation provides, the fact that Dr. Joseph was an examining psychologist, and not a treating psychologist, entitles her to lesser weight than that accorded a treating physician, and never to controlling weight. Her opinion would generally be accorded more weight, however, than that of a non-examining psychologist.

The ALJ was therefore required to evaluate the supportability of Dr. Joseph's opinions and their consistency with the record as a whole in determining the weight to accord that opinion. The ALJ here expressly stated:

> Even the consultative psychological evaluation arranged by counsel with psychologist Sharon Joseph, Ph.D. on September 30, 2008, noted no significant abnormal objective clinical signs with the claimant having normal concentration and memory, and moderately impaired social functioning, with a moderate GAF of 58. This evaluation thought does not support Dr. Joseph's medical source statement ("MSS") that the claimant has marked limitations, which is also not consistent with treatment records and evaluations, and is therefore given little weight.

The undersigned finds substantial evidence supports the ALJ's determination that Dr. Joseph's opinion was not supported by her own examination. Testing by Dr. Joseph showed Plaintiff's IQ was Verbal 83, Performance 79, and Full Scale 79 (R. 745). Achievement tests showed Plaintiff read at the high school level, spelled at the sixth grade level and performed math at the sixth grade level. Dr. Joseph noted "The Full Scale IQ score of 79 falls at the upper end of the Borderline Range of intellectual functioning." She then opined, however, that Plaintiff's intellectual functioning equaled the listing for mental retardation. This despite Plaintiff informing her that she never was in any special educations classes, her grade were B's and C's, and she obtained her GED and attended some college.

Regarding Dr. Joseph's diagnosis of Pain Disorder with both Physical and Psychological Components, the undersigned finds no support whatsoever in her own evaluation for that diagnosis.

29

The only mention of pain by Plaintiff in that evaluation report was: 1) in her daily activities, where she stated she could make the bed and cook if she didn't have to stand too long, and could go grocery shopping, but could not run the vacuum or clean the bathroom and could only climb a few stairs "due to her back problems;" 2) her reason for leaving her telemarketing job, which was "back problems;" and 3) that she seeks treatment for "back problems due to an injury in 1998."     No test results revealed any pain disorder.  Dr. Joseph did quote medical records including an MRI that showed some disc bulging; a normal EMG; pain prescriptions and a prescription for a TENs Unit; positive testing for cubital tunnel syndrome; a diagnosis of disc displacement, lumbar radiculopathy and low back pain; an epidural injection;  and a report from Dr. Orvik diagnosing low back pain with history of possible disc problems, bipolar disorder, and probable osteoarthritis.  None of these records suggest a pain disorder.  Required for a diagnosis of pain disorder is a finding that  "Psychological factors are judged to have an important role in the onset, severity exacerbation, or maintenance of the pain."  Dr. Joseph did not make that finding.

Dr. Joseph found the MMPI-2 Personality testing was valid, although at the same time noting, "responses to items near the end of the MMPI-2 were exaggerated in comparison to the earlier section," so clinical items were scored from the early section of the test.  Still, she warned, "caution is used in interpreting content and supplemental scales."  Those results indicated only that Plaintiff  may be passive and dependent, avoid confrontation and blame herself for interpersonal problems, may be prone to being easily hurt by others, may be introverted, shy and emotionally distant, uneasy and overcontrolled in social situations and may exhibit social withdrawal.  Dr. Joseph noted: "Such individuals may receive diagnoses such as Dysthymic Disorder, Anxiety Disorder, Dependent, or Compulsive Personality Disorder."  (Emphasis added).  Yet Dr. Joseph did not

diagnose any of those disorders, instead diagnosing Bipolar Disorder, Borderline Intellectual Functioning, and Pain Disorder. In other words, although Plaintiff argues Dr. Joseph should be accorded more weight because she performed more tests, those tests did not support her own opinion.

The undersigned finds nothing in the evaluation that supports Dr. Joseph's opinion that Plaintiff equaled the listings for a somatoform disorder or mental retardation, and nothing that supports her opinion that Plaintiff met listing 12.04(C), as already discussed.

Finally, there are inconsistencies in Dr. Joseph's report that undercut the credibility of the information provided to her by Plaintiff. For example, Plaintiff denied using tobacco and said she never had an alcohol problem. Yet even Dr. Joseph noted a report from USC by Plaintiff's own psychiatrist Dr. Scharf dated July 16, 2003, diagnosing Plaintiff in part with Alcohol Dependence, in partial remission. On February 28, 2009, when seen at the ER for acute bronchitis, Plaintiff reported smoking two to three packs of cigarettes daily, consistent with other reports. While Dr. Joseph cites the July 25, 2007 diagnosis from USC, stating that Plaintiff's medications at that time including Trazadone, depakote, Risperdal, buspar, vistaril and Cymbalta, and expressly noting the report states Plaintiff had decompensated, Dr. Joseph omits any mention that this decompensation was found to be due to Plaintiff's not taking any of her medications. (R. 744). Further, Dr. Joseph found the MMPI-2 Personality testing was valid, although at the same time noting, "responses to items near the end of the MMPI-2 were exaggerated in comparison to the earlier section," so clinical items were scored from the early section of the test. Still, she warned, "caution is used in interpreting content and supplemental scales."

Dr. Joseph's opinion is also inconsistent with virtually all of the other medical evidence in

the record. No other health care provider diagnosed borderline intellectual functioning or a pain disorder. No medical doctor diagnosed a pain disorder or found "Psychological factors are judged to have an important role in the onset, severity exacerbation, or maintenance of the pain."

Both of the two State agency reviewing psychologists found evidence did not establish the "C" criteria to meet or equal a listing. The ALJ accorded these decisions great weight, finding they were supported by the mental health treatment records from United Summit Center, "wherein the claimant has been consistently assessed a GAF of 60, with no abnormal clinical signs reported during the evaluations and was rated as having no more than mild restrictions in activities of daily living, social functioning and concentration through her last evaluation on January 20, 2009." As the ALJ noted, even Plaintiff herself rated her social functioning and concentration as only mildly impaired. She did have an assessed GAF of 49 since October 2008, but this was deemed to be due to the death of a beloved aunt from cancer. Additionally, her primary mental complaint was being stressed over her pending disability claim and financial matters.

Dr. Joseph's report is also inconsistent with another consultative evaluation, performed on March 19, 2008, only five months earlier, by Dr. Klein. Plaintiff told Dr. Klein she had been depressed but not as bad since her new medicine was started several weeks earlier. Although her mood was dysphoric and her affect restricted, Dr. Klein reported mostly normal activities and mental status, with only mild deficits in insight, recent memory, and social functioning; and normal concentration, persistence, pace, comprehension and immediate and remote memory. Her attitude was positive, her cooperation good, her eye contact good, and she had a sense of humor and was spontaneous.

Although Plaintiff does not argue regarding the ALJ's credibility finding, she does argue that

the ALJ erred by "ignoring" her "consistent reports that her medication caused her to be drowsy and fall asleep." (Plaintiff's brief at 6). In fact, Plaintiff's reports in this regard were not consistent.

Plaintiff reported no side effects from her medications in Functional reports to the SSA on July 26, 2007 (R. 205), and January 30, 2008 (R. 227). On August 1, 2008, Plaintiff reported to her health care provider at USC that some of her medications were effective, but "some ma[d]e her feel drowsy at times." (Emphasis added). On October 29, 2008, Plaintiff "did not report any negative side effects with her current medications" to USC. On January 20, 2009, "Plaintiff did not report any negative side effects with current medications" (R. 805).

Yet at the second administrative hearing held on May 5, 2009, Plaintiff stated she slept well at night due to her medications, but also then slept about seven additional hours during the course of the day, for a total of 18 to 19 hours in a 24-hour period (R. 51). She testified her doctors were aware of this. A review of the record, however, shows not only an inconsistency in Plaintiff's reporting of medication side effects, but there is no evidence she ever advised any health care provider that she slept 18 to 19 hours a day. Had she actually advised any prescriber of the severity of this side effect, he or she may have been able to change the dosage or type of medication to ameliorate that effect. The record, however, does not support that she ever reported such an extreme adverse side effect to anyone. Further, there is no record of any doctor advising her of such an extreme side effect or the need to avoid driving or hazards. Significantly, despite this alleged side effect and plaintiff's inconsistent claims that she could not drive because of it, she was never advised not to drive or avoid hazards, and never had her driving restricted. She apparently drove herself to all her doctor's appointments and consistently was "alert and fully oriented" during all office visits.

Plaintiff also made inconsistent statements regarding her ability to deal with other people,

especially authority figures. Plaintiff testified at the administrative hearing that she had had difficulty with the telemarketing job because people would get rude and it was very hard for her to keep from losing her temper. She testified: "I get agitated real easy. That's why when I go to the store I like to get in and out, because I can't stand to be around a bunch of people." She testified she had started cussing one of the callers at the job when he made some nasty remarks. Finally, she testified she had problems when the bosses would tell her to do something and then come back and tell her she didn't do it right, which got her upset, testifying she "had a problem with authority figures." Notably, however, she reported to the SSA on July 26, 2007, that her impairments did not cause her any problems getting along with others and that she got along with authority figures, including bosses, "fine." She again reported to the SSA on February 2008, that her impairments did not cause her any problems getting along with others and that she got along with authority figures, including bosses, "fine."

Finally, although only mentioned once in the record, the undersigned notes that Plaintiff first reported to SSA that she had pets, but only let them out and fed them. Then, later, she reported having no pets. Yet on August 4, 2008, she was apparently bitten by her own dog, which she said was a Chow– according to the American Kennel Club, a rather large, powerful dog which requires daily exercise and regular grooming and bathing. Owning such a pet is inconsistent with sleeping 18-19 hours every day and being unable to care for even her own basic hygiene and grooming.

For all the above reasons, the undersigned United States Magistrate Judge finds substantial evidence supports the ALJ's rejection of Dr. Joseph's MSS and opinion regarding Plaintiff's work-related functional limitations, and her diagnosis of pain disorder, as well as her opinion that Plaintiff met Listing 12.04(C).

## V. RECOMMENDATION

For the reasons herein stated, I find substantial evidence supports the Commissioner's decision denying the Plaintiff's application for SSI. I accordingly recommend Plaintiff's Motion for Summary Judgment [R.11] be **DENIED**, and Defendant's Motion for Summary Judgment [R. 14] be **GRANTED,** and this matter be **DISMISSED** from the Court's docket.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Frederick P. Stamp, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

DATED: *April 19, 2011*

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE